**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

BARBARA IZZARELLI,
      Plaintiff,

       No. 3:99-cv-2338 (SRU)

      v.

R.J. REYNOLDS TOBACCO CO.,
      Defendant.

<u>**ORDER ON PUNITIVE DAMAGES**</u>

This case is before me on remand for a recalculation of punitive damages, pursuant to a mandate from the Second Circuit. *See* Mandate, Doc. No. 502. For the reasons that follow, I award Barbara Izzarelli $8,000,000 in punitive damages. In addition, Izzarelli is entitled to offer-of-judgment interest up to the date an amended judgment enters.

**I.**       **Background**

Barbara Izzarelli initiated this products liability case in December 1999 against the manufacturer of Salem King cigarettes, R.J. Reynolds Tobacco Co. ("Reynolds"). She had been smoking Salem Kings for over twenty-five years and was treated for larynx cancer in 1997. Izzarelli filed an Amended Complaint in August 2000 alleging that Reynolds designed and manufactured its cigarettes with heightened addictive properties that delivered more carcinogens than necessary. *See* Doc. Entry No. 34. The case was originally assigned to District Judge Alan H. Nevas. The parties engaged in minor discovery motions practice in the early stages of the case, and on June 4, 2001, Izzarelli filed an Offer of Judgment for $400,000, which was ultimately rejected by Reynolds. *See* Doc. Entry No. 47. In July 2002, the discovery deadline was held open until 60 days after the Connecticut Supreme Court's ruling in a companion case, *Gerrity v. R.J. Reynolds*. Doc. Entry No. 56. The Connecticut Supreme Court issued its ruling

on April 15, 2003. *Gerrity v. R.J. Reynolds*, 263 Conn. 120 (2003). Throughout the next five years, the parties jointly filed fourteen Motions for Extension of Time, seeking to extend the fact and expert discovery deadlines and the dispositive motions deadline, all of which were granted. *See* Doc. Nos. 58, 83, 84, 94, 96, 109, 111, 127-2, 135, 138, 142, 149, 151, 153, 157, 195, 202.

The case was reassigned to me in February 2009. Doc. No. 219. Shortly thereafter, I held a status conference and set June 1, 2009 as the dispositive motions deadline and scheduled jury selection and trial for November 2009. Doc. No. 221. The dispositive motions deadline was then briefly extended and on June 15, 2009, Reynolds filed its Motion for Summary Judgment. Doc. Nos. 224, 226. After four Motions for Extension of Time and one Motion for Leave to File Excess Pages, Izzarelli filed her opposition to the Motion for Summary Judgment on October 30, 2009. *See* Doc. Nos. 229, 231, 234, 237, 239, 244. After two Motions for Extension of Time, Reynolds filed its reply on December 21, 2009. *See* Doc. Nos. 248, 254, 258. I held hearings on January 8 and 14, 2010 and denied in part and granted in part the Motion for Summary Judgment. Doc. Nos. 265, 267. The parties filed a stipulation regarding Izzarelli's Motion to Amend/Correct the Complaint, and Izzarelli filed her Amended Complaint on January 4, 2010. Doc. Nos. 251, 259, 262. Reynolds filed its Answer and a Supplemental Motion for Summary Judgment on January 20, 2010. Doc. Nos. 270, 271. I held a hearing on March 5, 2010 and granted in part and denied in part the Supplemental Motion for Summary Judgment. Doc. No. 298. In preparation for the coming trial, both Izzarelli and Reynolds filed many pretrial Motions in Limine in March and April 2010. *See* Doc. Nos. 302, 303, 304, 305, 306, 307, 308, 309, 310, 312, 314, 316, 322, 331, 339, 343, and 344. I held hearings on all pending motions on April 8 and 15, 2010. Doc. No. 350. Thereafter, jury selection was held on April 27, 2010 and trial began on April 28, 2010. Doc. Nos. 360, 362.

On May 26, 2010, after fifteen days of trial, the jury returned a verdict in Izzarelli's favor, finding that Reynolds was liable for her injuries under the theories of strict liability and negligent design. Verdict, Doc. No. 429. The jury awarded Izzarelli $325,000 in economic damages and $13,600,000 in non-economic damages for a total compensatory damages award of $13,925,000. *Id.* After the verdict, however, the parties stipulated that Izzarelli's economic damages should have only been $162,500; *see* Stipulation, Doc. No. 458; which reduced Izzarelli's compensatory damages to $13,762,500. In its verdict, the jury also allocated 42% fault to Izzarelli, which reduced her total compensatory damages award to $7,982,250. *See* Judgment, Doc. No. 474.

In addition, the jury found that Izzarelli had proven by a preponderance of the evidence that Reynolds should pay punitive damages. Verdict, Doc. No. 429. On December 21, 2010, I issued an order awarding punitive damages in the amount of $3,970,289.87, which represented $3,547,666.67 in attorneys' fees and $422,623.20 in non-taxable costs. Order, Doc. No. 470 at 17. Accordingly, Izzarelli's total damages award, including economic, non-economic, and punitive, was $11,952,539.87. *Id.* Thereafter, Izzarelli moved for an award of offer-of-judgment interest pursuant to Conn. Gen. Stat. § 52-192a.[1] *See* Doc. No. 471. On March 2, 2011, I issued an order awarding Izzarelli $16,127,086.40 in offer-of-judgment interest.[2] *See* Order, Doc. No. 487. Accordingly, Izzarelli's total judgment, including economic damages, non-economic damages, punitive damages, and offer-of-judgment interest, was $28,079,626.27. Amended Judgment, Doc. No. 489.

---

[1] The language of the statute has since been changed to use the phrase "offer of compromise" rather than "offer of judgment." At the relevant time here, though, the interest was called offer-of-judgment interest and, therefore, I will refer to it as such for convenience and continuity with previous orders.

[2] That amount included $15,777,352.00 for the period of December 6, 1999, the date the complaint was filed, up to and including December 5, 2010, and then $349,734.40 for the eighty-nine days between December 5 and March 4, 2011, when the Amended Judgment entered. *See* Amended Judgment, Doc. No. 489.

Reynolds moved for a new trial and/or for judgment as a matter of law (*see* Doc. No. 482), and moved for reconsideration of the offer-of-judgment interest award (*see* Doc. No. 490). All three motions were denied. *See* Orders, Doc. Nos. 491, 497. Thereafter, Reynolds filed an appeal with the Second Circuit and Izzarelli filed a cross-appeal. *See* Notice of Appeal, Doc. No. 498; Notice of Cross-Appeal, Doc. No. 499. The Court of Appeals certified questions to the Connecticut Supreme Court. *See Izzarelli v. R.J. Reynolds Tobacco Co.*, 321 Conn. 172 (2016). On July 7, 2017, the Second Circuit issued a Summary Order in which it affirmed the judgment with respect to liability, but vacated and remanded the judgment for a redetermination of punitive damages in light of the Connecticut Supreme Court's holding in *Bifolck v. Philip Morris, Inc.*, 324 Conn. 402 (2016). Summary Order, Doc. No. 501 at 10. Reynolds sought certification to the United States Supreme Court, which the Court denied. *R.J. Reynolds Tobacco Co. v. Izzarelli*, 138 S. Ct. 1165 (2018). I ordered the parties to submit supplemental briefing on the issue of punitive damages and held a hearing on June 21, 2018. *See* Order, Doc. No. 506; Minute Entry, Doc. No. 522. At the hearing, I took the parties' submissions and arguments under advisement.

## II. Punitive Damages

### A. Relevant Legal Principles

The punitive damages analysis here is governed by the Connecticut Supreme Court's decision in *Bifolck*, a case similar to *Izzarelli*, in which the plaintiff sued another cigarette manufacturer, Philip Morris, Inc., on behalf of his deceased wife's estate for her death from lung cancer. *Bifolck*, 324 Conn. 402. In that case, I certified the following question regarding punitive damages: "Does Connecticut's [common-law] rule of punitive damages, as articulated in *Waterbury Petroleum Products, Inc. v. Canaan Oil & Fuel Co.*, 193 Conn. 208 (1984), apply

4

to an award of statutory punitive damages pursuant to [Conn. Gen. Stat.] § 52-240b, the punitive damages provision of the [Connecticut Products Liability Act]?" *Id.* at 410. The Connecticut Supreme Court in *Waterbury Petroleum* determined that punitive damages should be limited to "the costs of litigation less taxable costs" which it opined would "fulfill the salutary purpose of fully compensating a victim for the harm inflicted on him while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury." 193 Conn. at 236-38.

The Connecticut Products Liability Act ("CPLA") provides: "Punitive damages may be awarded if the claimant proves that the harm suffered was the result of the product seller's reckless disregard for the safety of product users, consumers or others who were injured by the product. If the trier of fact determines that punitive damages should be awarded, the court shall determine the amount of such damages not to exceed an amount equal to twice the damages awarded to the plaintiff." Conn. Gen. Stat. § 52-240b. The *Bifolck* Court concluded that under the CPLA, punitive damages were not limited to the common-law rule of litigation expenses less taxable costs. *Bifolck*, 234 Conn. at 447. The Court opined that the common-law rule and the statutory provision were inconsistent in many respects, but that "statutory punitive damages are awarded on the basis of the same conduct that would justify an award of common-law punitive damages—reckless disregard of another's rights." *Id.* at 449. The Court also determined that the two methods were similar in that they both guarded against excessive punitive damage awards. *Id.* at 449-50 (common-law rule adopted to limit "the exercise of the jury's discretion by tying [punitive] damages to litigation expenses" and, with respect to the statute, "by vesting the court with authority to determine the amount of punitive damages and by limiting the amount of those damages in the act, the legislature provided an alternative method of reining in excessive

punitive damages"). The Court determined that the two methods differed, though, because "statutory damages are measured in relation to a multiple of compensatory damages, not litigation expenses" and "the statute vests the court with exclusive authority to determine the amount of damages, whereas the trier of fact traditionally had determined the amount of common-law punitive damages." *Id.* Further, the *Bifolck* Court reasoned that if it

> construe[d] the act to equate the statutory punitive damages to litigation expenses, in some cases the statute would have no effect or frustrate the purpose of the common-law rule. In any case in which litigation expenses are less than two times the damages, the statute would have no impact whatsoever, as the common-law recovery would already have been available. In any case in which the plaintiff's compensatory damages are relatively low in comparison to his or her litigation costs, the cap limiting punitive damages to twice compensatory damages would frustrate the purpose of common-law damages—fully compensating a victim for the harm inflicted on him. . . . This disparity would not be uncommon given the statutory reduction of compensatory damages in relation to comparative responsibility.

*Id.* at 451-52 (citations omitted; internal quotation marks omitted).

The *Bifolck* Court also took into consideration the award of attorneys' fees in relation to punitive damages in determining whether the common-law approach applied. *Id.* at 452. A different section of the CPLA provides: "If the court determines that the claim or defense is frivolous, the court may award reasonable attorney's fees to the prevailing party in a products liability action." Conn. Gen. Stat. § 52-240a. "When an award of attorney's fees pursuant to § 52-240a and an award of punitive damages pursuant to § 52-240b are both applicable, the combined effect of such awards would be substantially similar to [Conn. Gen. Stat. § 35-53, that we] interpreted to have punitive damages not limited by the common-law rule." *Bifolck*, 324 Conn. at 452. "If punitive damages in § 52-240b were interpreted to mean common-law punitive damages, then both §§ 52-240a and 52-240b would provide for attorney's fees, but under different contexts." *Id.* at 453. The Court identified "several concerns" that arose from that construction: (1) "attorney's fees under § 52-240a are not capped, as are punitive damages in

§ 52-240b"; and (2) "in cases in which a prevailing plaintiff has established both reckless disregard of safety and frivolous litigation conduct, the defendant would not be penalized for one of those wrongful acts." *Id*.

Although the Supreme Court determined that the common-law rule of punitive damages did not apply to products liability cases, it did not set out the correct method of calculating punitive damages. It has in the past, however, addressed the same question with respect to punitive damages claims under the Connecticut Unfair Trade Practices Act ("CUTPA"). *Ulbrich v. Groth*, 310 Conn. 375 (2013). There, the Court held, like in *Bifolck*, that the common-law rule of calculating punitive damages was not applicable to CUTPA claims. *Id*. at 449. The Court's reasoning in *Ulbrich* was substantially similar to that in *Bifolck*, namely that following the common-law rule would be duplicative, because CUTPA already provided for attorneys' fees in another statutory section.[3] *Id*. at 452. Having determined that the common-law computation of damages was inapplicable, the Court considered the relevant factors laid out by the United States Supreme Court in *Exxon Shipping v. Baker*, 554 U.S. 471 (2008), in determining punitive damages. *Ulbrich*, 310 Conn. at 452. The *Exxon* factors include: (1)"the degrees of relative blameworthiness, i.e., whether the defendant's conduct was reckless, intentional or malicious"; (2) "whether the defendant's [a]ction [was] taken or omitted in order to augment profit"; (3) "whether the wrongdoing was hard to detect"; (4) "whether the injury and compensatory damages were small, providing a low incentive to bring the action"; and (5) "whether the award will deter the defendant and others from similar conduct, without financially destroying the

---

[3] In *Ulbrich*, however, the Court noted that CUTPA "clearly imposes no specific limit on the ratio of punitive damages to compensatory damages" and, therefore, the Court would not apply any punitive damages cap relative to the compensatory damages awarded. *Ulbrich*, 310 Conn. at 453-54. Here, however, the punitive damages are limited in products liability cases to no more than two times the compensatory damages award. Conn. Gen. Stat. § 52-240b.

defendant." *Id*. at 454 (citing *Exxon Shipping*, 554 U.S. at 493-94, 503-04) (internal quotation marks omitted).

Further, the *Ulbrich* Court noted that a punitive damages award must also comport with due process. *Id*. at 455. The United States Supreme Court laid out the following relevant factors to consider in answering that question: "[1] the degree of reprehensibility of the defendant's misconduct; [2] the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; [and 3] the difference between the punitive damages awarded … and the civil penalties authorized or imposed in comparable cases." *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003). Among those factors, "the reprehensibility of a defendant's conduct is the most important[.]" *Ulbrich*, 310 Conn. at 455. "Reprehensibility is determined by 'considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.'" *Id*. at 455-56 (citing *State Farm*, 538 U.S. at 419).

In *State Farm*, the Supreme Court refused to adopt a bright-line ratio between punitive and compensatory damages but posited that "few awards exceeding a single-digit ratio … will satisfy due process." *State Farm*, 538 U.S. at 425. The Court further opined that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution[.]" *Id*. The Court tempered that opinion, though, in stating "ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages … however[, w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory

damages, can reach the outermost limit of the due process guarantee." *Id*. (citations omitted) (internal quotation marks omitted).

B. Discussion

Here, Izzarelli seeks the maximum punitive damages award permitted by statute, two times the amount of compensatory damages, totaling $15,964,500. Mot. for Punitive Damages, Doc. No. 514 at 40. As support, Izzarelli argues that Reynolds' conduct was particularly reprehensible and Izzarelli's injuries were sufficiently serious to warrant a maximum award. *See id.* Reynolds argues that a nominal punitive damages award would be sufficient because Izzarelli is already receiving sufficient damages that are punitive in nature, including non-economic compensatory damages and offer-of-judgment interest. Reynolds' Brief, Doc. No. 515 at 1, 6. Reynolds argues that any additional punitive damages award would violate due process. *Id*. at 6. Alternatively, Reynolds argues that, at most, a 1:1 ratio with compensatory damages would be appropriate. *Id*.

In light of the evidence at trial regarding Reynolds' decades-long conduct and the harm suffered by Izzarelli, a substantial punitive damages award is appropriate. I do not agree with Izzarelli, however, that she should be awarded the maximum award allowable under the CPLA. For the reasons that follow, I award Izzarelli $8,000,000 in punitive damages.

In my ruling on Reynolds' Motion for a New Trial and Renewed Motion for Judgment as a Matter of Law, I noted that the jury could have found the following facts regarding Izzarelli's injuries:

> Izzarelli began smoking when she was a young teenager and she chose Salem Kings[.] Izzarelli quickly became a heavily-addicted smoker who smoked daily two to three packs of Salem Kings. In 1996, at age 36 and after smoking daily for over 25 years, Izzarelli was diagnosed with stage T-3 squamous cell cancer of the larynx. She underwent surgery to remove her larynx, create an opening in her windpipe called a stoma, and position a laryngectomy tube. After surgery, Izzarelli received radiation treatment.

Izzarelli is cancer-free, but continues to have difficulties with the stoma and the laryngectomy tube. She quit smoking in January 1997.

Although it is uncommon for a woman in her 30s to develop laryngeal cancer, laryngeal cancer caused by smoking is dose-related; the more a person smokes, the greater the likelihood of developing the condition. Izzarelli smoked 2 to 3 packs a day for 25 years; the equivalent of smoking a pack a day for 30 to 50 years. Smoking is attributed as the cause of 95% of cancers of the larynx, with the other 5% attributed to toxic exposure. A person with a pack-a-day history similar to Izzarelli's has between a 6.9 and 20 times greater chance of developing laryngeal cancer than one who does not smoke. The heightened addictive properties of Salem Kings and the heightened level of tar they produce, coupled with Izzarelli's heavy smoking, permitted the jury to find that Izzarelli's injuries were a result of smoking Salem Kings.

Order, Doc. No. 497 at 10 (internal citations to the record omitted).

In the same ruling, I addressed the evidence before the jury regarding Reynolds' conduct

with respect to manufacturing its cigarettes:

Salem Kings are menthol cigarettes. The addition of menthol to Salem Kings reduce[d] the irritation of smoking…. Menthol enhances the effect of nicotine by [m]aking it easier to inhale and deliver the nicotine rapidly into the lungs so it gets to the brain quicker. The faster the drug gets there, the more kick you get from the drug. Menthol also has the added benefit of masking the bitter taste of nicotine. For younger or beginning smokers, menthol lessens the undesirable effects of smoking, making it easier to achieve a quicker kick….

The tobacco blend of Salems differed from that of Kools[, a Philip Morris manufactured menthol cigarette]; Salem Kings had a higher percentage of burley, Turkish, and reconstituted tobacco and a lower percentage of flue-cured tobacco and did not contain tobacco stems. This blend, R.J. Reynolds claimed, produced a smoother, milder, slower-burning product with a balanced tobacco/menthol taste as compared to Kools…. From 1963 to 1973, the tobacco industry saw … a growth in the use of menthol cigarettes. R.J. Reynolds attributed the increased use of menthol cigarettes to the consumer belief that menthol possessed health benefits….

In the early 1970s, R.J. Reynolds identified several areas of weakness in its Salem King brand. First, 47% of Salem smokers were classified as light smokers meaning those who smoked 1-15 cigarettes per day. Second, consumption was declining overall due to older smokers leaving the marketplace and increasing concerns about the safety of cigarettes. During that same period, R.J. Reynolds expressed a desire to increase its share of the under 18 market. In its efforts to capture a larger share of its desired market, R.J. Reynolds manipulated the nicotine level of Salem Kings through the use of additives and tobacco selection in order to increase smoker satisfaction….

Nicotine in smoke appears in two principal forms — free nicotine and bound nicotine. Free nicotine moves through the body's blood-brain barrier faster and provides the smoker with a higher and more immediate kick. The greater and faster the kick, the greater the addiction liability[, which is defined as the percentage of people who try the drug and become addicted. The addiction liability of nicotine is roughly 80-85 percent. The level of addiction is impacted by genetics, stress level, socio-economic status, and age of initiation.] R.J. Reynolds recognized two important factors concerning nicotine: (1) the form of delivery of nicotine affected whether the nicotine was slowly absorbed by the smoker or rapidly absorbed, thereby delivering a more potent nicotine kick, and (2) there is an effective dose range of nicotine required to maintain addiction….

In the 1972 memorandum entitled "Implications and Activities Arising from Correlation of Smoke pH with Nicotine Impact, Other Smoke Qualities, and Cigarette Sales," R.J. Reynolds acknowledged that rapid absorption of nicotine by the smoker's body is linked to the amount of free nicotine present in the smoke…. R.J. Reynolds identified seven methods for manipulating the nicotine kick of a cigarette: (1) increasing the amount of (strong) burley [tobacco] in the blend, (2) reduction of casing sugar used on the burley and/or blend, (3) use of alkaline additive, usually ammonia compounds, to the blend, (4) addition of nicotine to the blend, (5) removal of acids from the blend, (6) special filter systems to remove acids or add alkaline materials to the smoke, and (7) use of high air dilution filter systems. Its competitors, R.J. Reynolds noted, manipulated free nicotine by controlling the pH balance of the smoke. R.J. Reynolds expressed an intention to maintain the basic integrity of its Salem Kings but to match its competitors' market share. Salem Kings had a pH level of 6.0-6.2 during the late 1960s and early 1970s….

R.J. Reynolds did not use pH level manipulation to alter the level of free nicotine, rather R.J. Reynolds boasted that it had caught up to its competitors and that it had done so utilizing other methods to increase the level of free nicotine in its products. R.J. Reynolds stated that "[w]e've caught up to [Philip Morris] with respect to nicotine technology. Our approach has been primarily one of controlling the smoke parameters by blend formulation and denicotinization rather than by addition or transportation of nicotine." R.J. Reynolds' memorandum, "Nicotine Delivery and Control," indicates that it had successfully accomplished nicotine delivery manipulation through blend formulation and methods other than pH manipulation.

With respect to blend formulation, R.J. Reynolds understood that the tobacco blend affected the ultimate nicotine and tar delivery to the smoker. Although nicotine occurs naturally in tobacco, its levels vary by plant, stalk position, and crop year. Notably, R.J. Reynolds discovered that (when altered with fructose alone or fructose/ammonia gas mixture) the tobacco blend formulation G7 used in Winston and Salem products increased the amount of nicotine in the cigarette as well as the percentage of nicotine transferred to the smoker….

Salem King cigarettes also contained sugar and ammonia, components identified by R.J. Reynolds as impacting the level of free nicotine in a cigarette…. Sugar … masked the bitterness of and increased the potency of the nicotine. Ammonia reinforced the effects

of nicotine by increasing its content in the cigarette smoke and allowing it to move more rapidly across the blood-brain barrier. The chemical acetaldehyde was also used to cut the harshness of the nicotine and reinforce its effects….

With respect to the effective dose range of nicotine required to maintain addiction, R.J. Reynolds understood that, although an increase in free nicotine would enhance the addictive property of the cigarette, a decrease in the nicotine yield of the cigarette would increase the number of cigarettes required to meet the addiction demand. R.J. Reynolds recognized that "a given smoker on a given day has a rather fixed per hour and per day requirement for nicotine. Given a cigarette that delivers less nicotine than he desires, the smoker will subconsciously adjust his puff volume and frequency, and smoking frequency, so as to obtain and maintain his per hour and per day requirement for nicotine (or, more likely, will change to a brand delivering his desired per cigarette level of nicotine.)" The effective daily dosage required to maintain addiction is five to eight milligrams of nicotine per day.

As early as 1959, R.J. Reynolds concluded that the nicotine yield should range from 1.5 to 2.0 mg per cigarette. When introduced to the market in 1956, Salem Kings had a nicotine yield of 3.10 mg per cigarette. After its 1959 study of effective nicotine yields, the nicotine yield in Salems dropped to 1.80 mg per cigarette and remained in the 1.5 to 2.0 mg range until 1966. During the years that Izzarelli smoked, Salem Kings were designed to deliver 1.3 milligrams per cigarette of nicotine and 18-19 milligrams per cigarette of tar. It was no accident that Salem Kings had a nicotine yield of 1.3 mg/cigarette. By maintaining the nicotine yield at that level, Salem Kings could deliver a daily effective dose of nicotine in the 5-8 mg per day range but the smoker would have to consume more cigarettes in order to achieve full satisfaction.

The fact that the smoker needed to smoke more cigarettes to achieve full satisfaction had two obvious results. First, the smoker would purchase more cigarettes. Second, the smoker would be exposed to more carcinogens, namely tar. "Tar" is the tobacco industry term used to describe all byproducts of smoking the tobacco other than water and nicotine. Tar yield is affected by the type of filter used, the type of paper used, how the paper is ventilated, the length and composition of the filter and the cigarette itself, as well as the blend of tobacco used in the cigarette. During the years Izzarelli smoked, Salem Kings contained approximately 15-19 milligrams of tar; during those years, however, R.J. Reynolds possessed the capability to reduce the level of tar to one milligram or less. Because the causal relationship between smoking and cancer is dose-related, the downward manipulation of the nicotine yield increased the smoker's exposure to tar and risk of developing cancer.

*Id*. at 3-9 (internal citations to the record and internal quotation marks omitted). From that

evidence, I determined that "the jury could have reasonably found that R.J. Reynolds

manipulated and altered the tobacco and chemical additives in Salem Kings to enhance the

addictive nature of the product, increase the number of cigarettes smoked by the consumer, and ultimately deliver a higher level of carcinogens to the consumer as compared to other cigarette products." *Id*. at 9.

The conduct of the defendant, that is, the degree of reprehensibility, is the "most important indicium of the reasonableness of a punitive damages award." *State Farm*, 538 U.S. at 419. Reprehensibility is defined, in part, by indifference or reckless disregard of the health and safety of others. *Id*. Here, the jury, in finding that Reynolds should pay punitive damages, necessarily found that Reynolds acted recklessly. *See* Jury Instructions, Doc. No. 412 at 23-24 ("Whether you decide to award punitive damages against [Reynolds] should be based on whether you find that the conduct of [Reynolds] giving rise to liability in this case recklessly or wantonly disregarded the safety of consumers or users of Salem Kings. Reckless or wanton conduct means conduct more reprehensible than negligence or even gross negligence. If the defendant was reckless or wanton, then it had utter disregard of the consequences that might follow from its acts."). The evidence at trial, as summarized in my ruling on Reynolds' post-verdict motions indicate that Reynolds' conduct was highly reprehensible: Salem Kings were extremely carcinogenic and addictive, and were intentionally manufactured that way; Reynolds knew that the product was harmful to smokers but continued to sell the cigarettes despite such knowledge; and consumers were actively misled about the health risks. The evidence at trial also established that this reprehensible conduct by Reynolds related to and affected Izzarelli, who suffered extreme adverse health effects because she smoked Salem Kings. Those facts support the conclusion that Reynolds acted recklessly and intentionally in manufacturing Salem King cigarettes in a way that would increase addiction and increase the risk of cancer. That intentionality leads me, and clearly led the jury, to believe that Reynolds acted with indifference

and reckless disregard to the health and safety of its consumers. Further, the evidence at trial established that Reynolds engaged in wrongful conduct in order to increase its profits, a factor that weighs in favor of punitive damages under *Exxon Shipping*. *See Ulbrich*, 310 Conn. at 454. Reynolds wanted to increase its share of the market, compete with Kool, and increase sales and profit. It did so by augmenting its cigarettes in order to increase their addictiveness, in disregard for the health risks that decision posed to its consumers. Accordingly, a substantial punitive damages award is warranted based on Reynolds' reprehensible conduct.

Further, in fashioning an award that comports with due process, I must compare the amount of compensatory and punitive damages, the ensure a reasonable ratio. *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 583 (1996). Here, Izzarelli suffered larynx cancer, which required the removal of her larynx. The jury awarded her $7,982,250 in compensatory damages, after a 42% reduction for her portion of the fault. *See* Judgment, Doc. No. 474. Pursuant to Connecticut state law, I must not award an amount in punitive damages that is more than double the amount of compensatory damages. Conn. Gen. Stat. § 52-240b. There is no "mathematical bright line" defining a reasonable ratio of compensatory to punitive damages. *State Farm*, 538 U.S. at 425. Ratios on the higher end are justified when there is an "injury that is hard to detect" or a "particularly egregious act [that] has resulted in only a small amount of economic damages." *Gore*, 517 U.S. at 582. Neither of those factors is present here. Although Izzarelli suffered, and continues to suffer, harmful health effects from her years of smoking Salem Kings, her injury is not one that would be considered hard to detect, and an almost $8 million compensatory damages award is certainly not considered small. An $8 million punitive damages award, essentially equal to her compensatory damages award, is an appropriate award in recognizing both Izzarelli's substantial injuries and Reynolds' reprehensible conduct. Further, a 1:1 ratio of

punitive damages to compensatory damages certainly complies with due process requirements established by the Supreme Court.

A comparison of an award of $8 million in punitive damages, on a roughly $8 million compensatory damages award, to similar cases, as *State Farm* suggests, further supports its appropriateness. *State Farm*, 538 U.S. 408, 418. Tobacco companies, including Reynolds, are no strangers to consumer litigation and punitive damage awards. A review of similar tobacco litigation reveals a wide range of punitive damage awards assessed against tobacco companies and the award provided here is in line with the punitive damages awarded in similar cases. *See Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594 (8th Cir. 2005) (holding that a nearly 1:1 ratio was appropriate in a suit against tobacco company under design defect theory when plaintiff, who was diagnosed with lung cancer and later died, was awarded $4,025,000 in compensatory damages, it was appropriate to remit $15 million punitive damage award to $5 million); *Brown v. R.J. Reynolds Tobacco Co.*, 113 F. Supp. 3d 1233, 1239-40 (M.D. Fla. 2015) (awarding $9 million in punitive damages, a 1.08:1 punitive to compensatory ratio); *Searcy v. R.J. Reynolds Tobacco Co.*, 2013 WL 5421957, at *7 (M.D. Fla. 2013) (finding that 1.67:1 ratio was appropriate where compensatory damages were remitted to $1 million); *Burkhart v. R.J. Reynolds Tobacco Co.*, 884 F.3d 1068 (11th Cir. 2018) (affirming award of $5 million in compensatory damages and $1.8 million in total punitive damages from three tobacco companies for a ratio of 0.4:1); *Schoeff v. R.J. Reynolds Tobacco Co.*, 232 So. 3d 294 (Fla. 2017) (holding that 3.8:1 ratio was appropriate where compensatory damages were $7.9 million and punitive damages were $30 million in case involving claims of intentional torts). Further, a punitive damages award of this amount will not lead to Reynolds' financial ruin, nor does Reynolds argue that it would. It comes as no shock that Reynolds is a wealthy company, and therefore, a

nominal punitive damages award would not serve to deter such wrongful behavior in the future. *Exxon Shipping*, 554 U.S. at 504.

Reynolds' argument that only a nominal punitive damages award would be appropriate is unavailing. Reynolds argues that Izzarelli has already received a windfall in non-economic compensatory damages and offer-of-judgment interest (discussed more fully below) and, therefore, any amount of punitive damages would violate due process. Courts make quite clear, however, that "[t]he occasion for awarding punitive damages is quite different than that of awarding compensatory damages[.]" *Champagne v. Raybestos-Manhattan, Inc.*, 212 Conn. 509, 532 (1989). Punitive damages are awarded as a "punishment against a defendant for the quality of his conduct and of deterrence to a defendant or others against such conduct in the future", *id.*, whereas compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *State Farm*, 538 U.S. at 416. Punitive damages "serve a broader function" than compensatory damages and because the two "serve different purposes", they are awarded together. *Id.*

Accordingly, for all of the foregoing reasons, an award of $8 million in punitive damages is appropriate here in recognition of Reynolds' conduct and Izzarelli's injuries. In comparison to the almost $8 million compensatory damages award and similar cases, this amount comports with due process.

## III.    Offer-of-Judgment Interest

Previously, I awarded Izzarelli $16,127,086.40 in offer-of-judgment interest up to March 4, 2011, the date of the amended judgment. Reynolds makes the following arguments: (1) offer-of-judgment interest is inapplicable to this case; (2) even if it was, it stopped accruing as of the date of entry of the judgment on March 4, 2011, and, accordingly, has not accrued between then

and the date of any new judgment; and (3) offer-of-judgment interest is punitive in nature and,

therefore, should be considered in determining a constitutionally permissible punitive damages

ratio.  Reynolds Brief, Doc. No. 515 at 9-12.  None of those arguments is persuasive to me and I

will award Izzarelli offer-of-judgment interest up to the entry of a second amended judgment.

A.  Relevant Legal Principles

Connecticut's offer of judgment statute, Conn. Gen. Stat. § 52-192a(a)[4], provides, in

relevant part:

> [A] plaintiff may … file with the clerk of the court a written offer of [judgment] signed
> by the plaintiff or the plaintiff's attorney, directed to the defendant or the defendant's
> attorney, offering to settle the claim underlying the action for a sum certain…. Within
> thirty days after being notified of the filing of the offer of [judgment] and prior to the
> rendering of a verdict by the jury or an award by the court, the defendant or the
> defendant's attorney may file with the clerk of the court a written acceptance of the offer
> of [judgment] agreeing to settle the claim[.]

Subsection (c) provides in relevant part:

> If the court ascertains from the record that the plaintiff has recovered an amount equal to
> or greater than the sum certain specified in the plaintiff's offer of [judgment], the court
> shall add to the amount so recovered [twelve[5]] per cent annual interest on said amount …
> The interest shall be computed from the date the complaint in the civil action … was filed
> with the court[.]

Conn. Gen. Stat. § 52-192a(c).  The purpose of offer-of-judgment interest, pursuant to section

52-192a is to

> encourage pretrial settlements and, consequently, to conserve judicial resources.  The
> strong public policy favoring the pretrial resolution of disputes … is substantially
> furthered by encouraging defendants to accept reasonable offers of judgment.  Section

[4] The current language of the statute is substantially similar to that of the version in place at the time this suit was brought.  Accordingly, I have cited the language of the current statute and changed words where appropriate to comport with the former version.

[5] At the time Izzarelli filed her Offer of Judgment, the statutory interest rate for offer-of-judgment interest was 12%.  Conn. Gen. Stat. § 52-192a (2001).  In 2005, the legislature amended the statute to reflect an 8% interest rate on offer-of-judgment interest.  Conn. Gen. Stat. § 52-192a. The amendment, however, does not apply to actions accruing before October 1, 2005 and, therefore, the 12% rate is applicable here.  Conn. Gen. Stat. § 52-192a (2005), as amended by Public Acts 2005 No. 05-275 § 4 ("Effective October 1, 2005, and applicable to actions accruing on or after said date.").

> 52-192a encourages fair and reasonable compromise between litigants by penalizing a party that fails to accept a reasonable offer of settlement. In other words, interest awarded under § 52-192a is solely related to a defendant's rejection of an advantageous offer to settle before trial and his subsequent waste of judicial resources.

*Blakeslee Arpaia Chapman, Inc. v. EI Constructors, Inc.*, 239 Conn. 708, 742 (1997) (internal citations and quotation marks omitted). Section 52-192a is rationally related to the legislature's goal of "encouraging early, fair and reasonable settlement." *Id.* at 758-59.

The Connecticut Supreme Court construes the term "recovered" narrowly, but "the amount 'recovered' for purposes of [section] 52-192a is limited to the amount reflected in a judgment." *Elgard Corp. v. Brennan Construction Co.*, 388 F.3d 30, 37 n.5 (2d Cir. 2004); *see also Civiello v. Owens-Corning Fiberglass Corp.*, 208 Conn. 82, 90 (1988) (holding that judgment by court is relevant amount, rather than jury verdict, in determining whether offer of judgment was less than amount recovered).[6] An award under this statute is calculated on the entire amount recovered, including both punitive and compensatory damages. *Kregos v. Stone*, 88 Conn. App. 459, 467 (Conn. App. 2005) ("The court properly interpreted the word 'recovered' to include the entire verdict, both punitive and compensatory damages."); *Boulevard Associates v. Sovereign Hotels, Inc.*, 861 F. Supp. 1132, 1141 (D. Conn. 1994) (awarding offer-of-judgment interest on entire award including punitive damages), *rev'd on other grounds*, 72 F.3d 1029 (2d Cir. 1995); *Gionfriddo v. Avis Rent a Car System, Inc.*, 192 Conn. 301, 307 (1984) (awarding offer-of-judgment interest on treble damages).

Offer-of-judgment interest runs until "the date of the court's judgment." *Loomis Inst. v. Town of Windsor*, 234 Conn. 169, 179 (1995). The Second Circuit has clarified, though, that judgment must be "ascertained in a meaningful way" in order to stop pre-judgment interest from

---

[6] If interest were to stop accruing at the date of the original judgment, and an amended judgment was later filed to correct an error, a plaintiff could be denied interest on money it legally recovered, in contravention to the mandates of the statute.

accruing.  *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 104-05 (2d Cir. 2004).  When a district court "correctly determines liability but errs in applying the appropriate method to calculate damages," the original judgment "was not ascertained in a meaningful way."  *Id*. Although the court in *Westinghouse* was tasked with determining when *post*-judgment interest began to accrue, the holding is still instructive and applicable here because it logically follows that when post-judgment interest begins to accrue, pre-judgment interest ceases to accrue.  *Id*. at 98 ("The demarcation between [pre-judgment interest and post-judgment interest] occurs when a meaningful judgment is entered.").  The Second Circuit in *Westinghouse* held that the original judgment was not ascertained in a meaningful way, because it was vacated on appeal,[7] and, therefore, the date the new judgment entered was the date on which pre-judgment interest ceased accruing, and post-judgment interest began accruing.  *Id*. at 104.

B.  Discussion

Reynolds argues first that offer-of-judgment interest stopped accruing on March 4, 2011, when the Amended Judgment, which included offer-of-judgment interest, entered.  As support for its argument that offer-of-judgment interest on the punitive damage award should stop accruing on the date of the original judgment, Reynolds cites to *Elgard*.  Indeed, in *Elgard*, the Second Circuit awarded the plaintiff offer-of-judgment interest until September 30, 1999, the date judgment entered.  *Id*. at 37 n.5.  The Court then reversed the denial of the plaintiff's request for attorneys' fees and vacated the judgment and "remanded for recalculation consistent with this opinion, including prejudgment interest and attorney's fees under [Conn. Gen. Stat.] § 49-42, and offer-of-judgment interest under [section] 52-192a."  *Id*. at 39.  In a footnote, the Court explained

---

[7] In *Westinghouse*, the original judgment confirmed an arbitration award, but did not include damages due to an erroneous application of recoupment or setoff, a judgment that was vacated on appeal.

what it meant by "consistent with this opinion": "The calculations made in this opinion are based on the record on appeal. The district court is free to adjust them as appropriate to ensure that the final award is consistent with any conventions not reflected in this opinion (*e.g.*, the counting of days between particular dates)." *Id*. at n.6. Although the Court awarded interest until the date of the judgment on record at the time of the appeal, it is not clear to me that the court intended that to be the final date of interest calculation or, rather, whether it intended the district court to recalculate when a new judgment entered. It is possible that the Second Circuit laid out its calculation in a footnote so the district court would know how to recalculate the interest up to the date of a new judgment. Without further clarification from the Second Circuit regarding its intentions, the footnote cannot support the hefty weight Reynolds places upon it.[8] Accordingly, because the punitive damage award to Izzarelli was incorrectly calculated in the March 4, 2011 judgment, it was not ascertained in a meaningful way. Offer-of-judgment interest on the new punitive damage award will continue to run until a second amended judgment is entered.

Reynolds argues next that the offer-of-judgment interest awarded to Izzarelli should limit the amount of punitive damages she is awarded. Although I recognize that Izzarelli is receiving a substantial amount in offer-of-judgment interest, I do not agree that it should factor into the punitive damages analysis above. A punitive damages award is based upon the defendant's underlying conduct that gave rise to the suit, whereas offer-of-judgment interest is based upon the defendant's actions while the suit is pending and "does not depend on an analysis of the underlying circumstances of the case or a determination of the facts." *Accuttullo v. Worcester Ins. Co.*, 256 Conn. 667, 672 (2001). Accordingly, because punitive damages and offer-of-

---

[8] On remand, the district court denied a motion for recalculation of offer-of-judgment interest on attorneys' fees and the plaintiff appealed. *Elgard Corp. v. Brennan Const. Co.*, 248 Fed. App'x. 220 (2d Cir. 2007) (summary order). The Second Circuit declined to review the merits of the appeal, however, "because of the appellant's egregious lapses in appellate protocol." *Id*. at 221.

judgment interest serve two different purposes, there is no merit to Reynolds' argument that offer-of-judgment interest should be taken into consideration when fashioning a punitive damages award.[9]

Finally, Reynolds "preserves for any appeal" its argument that the offer-of-judgment statute is inapplicable to diversity cases in federal court because of its procedural nature. Although Reynolds states that it "renews" this argument, it did not make this argument in 2011 when the offer-of-judgment issue was initially briefed, *see* Doc. No. 477, nor does it appear that Reynolds raised this argument in its appeal to the Second Circuit. *See* Summary Order, Doc. No. 501. Accordingly, any argument about the applicability of the statute has been waived.

Even if not waived, the argument is without merit. In 1981, the district court explicitly held that section 52-192a "clearly creates a substantive statutory right" and was thus applicable in a diversity action. *Frenette v. Vickery*, 522 F. Supp. 1098, 1100 (D. Conn. 1981). Further, courts in this District have consistently applied section 52-192a to diversity cases. *See Murphy v. Marmon Group Inc.*, 572 F. Supp. 856, 858 (D. Conn. 1983); *Boulevard*, 861 F. Supp. at 1143; *Hardy v. Saliva Diagnostic Systems, Inc.*, 52 F. Supp. 2d 333, 342 (D. Conn. 1999) ("The offer of judgment statute is applicable to diversity actions in federal court[.]"). Indeed, the applicability of the offer-of-judgment statute in federal court is so established that it is the subject of a local rule. *See* L. R. Civ. P. 68.

Notably, the Second Circuit awarded offer-of-judgment interest, pursuant to section 52-192a, in *Elgard*, a diversity case relied heavily upon by Reynolds for its argument that interest

---

[9] Further, as I mentioned at oral argument, Reynolds could have avoided the imposition of offer-of-judgment interest by settling the case any time before judgment entered. Izzarelli's filing of an offer of judgment early in the case suggests a willingness on her part, at least in the beginning of the case, to settle. Had Reynolds accepted that offer or a later offer to settle, no offer-of-judgment interest would have been called for by statute and this case would have closed long before now, nearly twenty years after it was filed.

stopped accruing at the time of the original judgment. *Elgard*, 388 F.3d at 36-37. Nevertheless, in support of its argument, and in the face of overwhelming precedent from this Circuit, Reynolds merely cites to one case in which the Ninth Circuit held that an Alaskan offer-of-judgment statute was procedural in nature. *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1332 (9th Cir. 1995). Reynolds' argument that section 52-192a is inapplicable to this case is meritless.

Accordingly, Izzarelli is entitled to offer-of-judgment interest, and the award shall be calculated from December 6, 1999 (the date Izzarelli's complaint was filed) to the date the second amended judgment enters. *See* Conn. Gen. Stat. § 52-192a (2001) (when offer of judgment is filed after October 1, 1981, trial court is required to award interest to the prevailing plaintiff from the date of the filing of the complaint if such offer was filed within eighteen months of the filing of the complaint).

With the $8 million punitive damages award as outlined above, Izzarelli's total award of compensatory and punitive damages equals $15,982,250. The offer-of-judgment interest accrues at a rate of 12% per annum and is calculated as follows: for the period of December 6, 1999 up to and including December 5, 2018, Izzarelli shall be awarded $36,439,530 in offer-of-judgment interest. For each day thereafter until the second amended judgment enters, Izzarelli shall be awarded $5,254.44 per day.

IV. **Attorneys' Fees**

As outlined above, a common-law award of punitive damages is based on attorneys' fees and costs, which is how I calculated the original punitive damages award here. The *Bifolck* decision abrogated that rule for purposes of claims brought under the CPLA and determined that attorneys' fees are not a part of the punitive damages calculation, because parties can seek

statutory attorneys' fees in those cases. The CPLA provides: "If the court determines that the claim or defense is frivolous, the court may award reasonable attorney's fees to the prevailing party in a products liability action." Conn. Gen. Stat. § 52-240a. Frivolous means "'of little or no weight, value or importance … having no reasonable ground or purpose'"; *Deutsch v. United States*, 67 F.3d 1080, 1085-86 (10th Cir. 1995) (quoting The Oxford English Dictionary 556 (1987)); and "'[l]acking a legal basis or legal merit[.]'" *United States v. Lain*, 640 F.3d 1134, 1137 (10th Cir. 2011) (quoting Black's Law Dictionary (8th ed. 2004)).

Although Izzarelli has not necessarily sought attorneys' fees under section 52-240a, it is prudent to analyze the issue here, because Izzarelli had been awarded attorneys' fees in the past under the punitive damages calculation. Reynolds' defenses are plainly not frivolous and, therefore, Izzarelli is not entitled to attorneys' fees pursuant to CPLA. In essence, Reynolds defended this case with its claims that its cigarettes were not defective or unreasonably dangerous, Izzarelli could not prove that her cancer was caused by Reynolds' alleged prohibited conduct, and Izzarelli knew the risks of smoking before she ever began. *See* Motion for Summary Judgment, Doc. No. 226-2 at 1. None of those defenses lacks legal basis or merit. Indeed, if Reynolds' defenses *were* frivolous, one would think that the case would not have been as hotly litigated as it was, with an incredible amount of discovery, many experts, and dozens of pre-trial motions. Surely, if the defenses were frivolous, this case would have been decided long before trial, which took place nearly ten years after the case was filed, perhaps by way of summary judgment in favor of the plaintiff. To the contrary, I granted summary judgment in part in favor of Reynolds on the issues of youth marketing, failure to warn, and CUTPA. *See* Tr. Doc. No. 273 at 47-48. Further, when the case did go to trial, the jury deliberated for over nine hours and, although it found in favor of Izzarelli on liability, it also found her 42% responsible

for her own injuries, highlighting the difficulty of this case. *See* Minute Entry, Doc. No. 409; Minute Entry, Doc. No. 410; Tr. Doc. No. 426; Tr. Doc. No. 427; Verdict, Doc. No. 429.

Accordingly, although Izzarelli ultimately was the prevailing party, she did not do so by defeating meritless and baseless, and therefore frivolous, defenses raised by Reynolds. Therefore, Izzarelli is not entitled to attorneys' fees under section 52-240a of the CPLA.

## V.      Conclusion

For the foregoing reasons, Izzarelli's total damages are as follows: compensatory damages in the amount of $7,982,250; punitive damages in the amount of $8,000,000; and offer-of-judgment interest the amount of $36,439,530 up to and including December 5, 2018 plus $5,254.44 per day until the second amended judgment enters. The clerk shall issue a second amended judgment to reflect the updated award of punitive damages offer-of-judgment interest.

So ordered.  Dated at Bridgeport, Connecticut, this 13th day of December 2018.

<u>/s/ STEFAN R. UNDERHILL</u>
Stefan R. Underhill
United States District Judge